UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.A., et al., | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 16-248 (RBW) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM OPINION

This case concerns the education of a young girl who, by all accounts, is a bright student, but who struggles with the effects of past emotional trauma. The plaintiffs are the student, A.A., and her parents, E.A. and S.A., who filed this action on behalf of their daughter alleging that the District of Columbia (the "District"), through the local public school system, the District of Columbia Public Schools ("DCPS"), violated the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482 (2012), by failing to provide A.A. with a free appropriate public education as a child with an emotional disability. Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1. As a consequence of the alleged deprivation, the parents represent that they were forced to place A.A. in a nonpublic school, id., and they seek reimbursement for the costs of A.A.'s private school instruction for the 2015–2016 school year, id.; see also id. at 22. Currently before the Court are the Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") and the Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, and Cross[-]Motion for Summary Judgment ("Def.'s Mot."). Upon consideration of

the administrative record ("AR") and the parties' submissions,[1] the Court concludes that it must grant in part and deny in part the plaintiffs' motion and deny the District's motion.[2]

## I. BACKGROUND

A.A. first came to live with S.A. and E.A., her adoptive parents, in February 2012, when she was three-and-a-half years old. AR at 524. She was initially placed with her adoptive parents after having been found alone in her biological mother's apartment. Id. at 525. At some point prior to her placement with her adoptive parents, A.A.'s five-week-old younger sister died suddenly, and A.A. witnessed and may have been subjected to physical abuse while in her biological mother's care. See id. at 39. For a period of approximately two months after she was placed with S.A. and E.A., A.A. did not know the whereabouts of her biological mother. See id. at 527. During this time, A.A. was "distressed, . . . really distressed." Id. She would engage in inappropriate behavior including "hitting, kicking, [and] biting," along with having a "really low frustration tolerance." Id. at 528.

A.A. was enrolled in pre-kindergarten at Walter Jones Education Campus ("Walter Jones"), a DCPS school, which she attended for "the end of the school year for 3-year-old year and then the full following year." Id. Although A.A.'s "pre[-]school 3 year was not as eventful

---

[1] In addition to the documents already identified, the Court also considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem."); (2) the Plaintiffs' Statement of Facts as to Which There Is No Genuine Issue ("Pls.' Facts"); (3) the Memorandum of Points and Authorities in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, and Cross[-]Motion for Summary Judgment ("Def.'s Mem."); the (4) the Plaintiffs' Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Pls.' Reply"); and (5) the Defendant's Reply to Plaintiffs' Opposition to Defendant's Cross[-]Motion for Summary Judgment ("Def.'s Reply").

[2] In addition to the cross-motions for summary judgment, the plaintiffs filed their [] Motion for Additional Evidence, requesting that the Court review "additional evidence . . . on the issue of A.A.'s continued qualifying disabling behaviors and psychiatric hospitalizations." Plaintiffs' Motion for Additional Evidence ("Pls.' Evid. Mot.") at 1. Over objection, see generally Defendant[']s Opposition to Plaintiffs' Motion for Additional Evidence ("Def.'s Opp'n to Pls.' Evid. Mot."), the Court will grant the plaintiffs' request under its authority to "hear additional evidence at the request of a party" and base its decision of whether to uphold or disturb the administrative hearing officer's determination on the "preponderance of the evidence" standard of review, 20 U.S.C. § 1415(i)(2)(C).

as the pre-[school] 4 year[,]" id. at 529, "during [t]he pre-[school] year, she exhibited a lot of behaviors— the hitting her teacher, and kicking, [and] biting," see id., which prompted the creation of a two-page "daily support plan . . . to help [A.A.] cope," id. at 530; see also id. at 36–37.  A.A. was then enrolled in kindergarten at the Tyler Elementary School ("Tyler School"), another DCPS school, for the 2013–2014 school year.  Id.  After contacting the Tyler School to discuss A.A.'s "particular history," id. at 531, E.A. was informed that the Tyler School's staff would be provided a copy of the daily support plan that had been developed for A.A. at Walter Jones, id. at 532.

In October 2013, DCPS conducted an educational assessment of A.A. after she was "referred . . . due to concerns regarding her social and emotional development."  Id. at 38.  "The . . . assessment [was] intended to be part of the evaluation process to determine if [A.A. was] eligible for special education services . . . ."  Id.  The assessment report concluded that A.A. was in the "high average" or "average" range in academic ability, see id. at 39–40 (discussing the Young Children's Achievement Test and setting forth A.A.'s results), but that she demonstrated clinically-significant levels of "inattention/hyperactivity," "defiant/aggressive behaviors," "anxiety," and "mood and affect" problems, based on scores provided by one of A.A.'s parents and her kindergarten teacher, Patricia Wilkins, see id. at 44, 47.  After a multi-disciplinary team meeting in November 18, 2013, which included A.A.'s parents, A.A. was determined ineligible for special education services under the developmental delay category of the IDEA.  Id. at 53.  A.A.'s kindergarten report card shows that she was performing at a proficient or advanced level in all areas except World Languages.  See id. at 61.

In August 2014, A.A. began her first-grade year in the Tyler School's Spanish Immersion Program, during which half of the day was spent in a Spanish-speaking classroom, and the other

3

half in an English-speaking classroom. Id. at 538. She began exhibiting "anxiety behaviors—hiding under the desk, wetting herself, running around the classroom, [and] eloping [i.e., running away]," resulting in the school requesting a meeting with A.A.'s parents. Id. at 540; see also id. at 71 (August 27, 2014 e-mail requesting an urgent meeting regarding A.A.'s "current classroom placement"). E.A. testified during the administrative hearing in this matter that, at a subsequent meeting, school officials advised her that the Tyler School did not "typically have children with behavior problems or special needs in the Spanish Immersion Program and they don't typically provide 'that level of support.'" Id. at 541. E.A. and S.A. reluctantly agreed to have A.A. temporarily removed from of the Spanish Immersion Program and placed in a general education classroom, purportedly because the "Tyler [School was] unwilling to provide accommodations in her current class to keep her safe," see id. at 78; see also id. ("We are not agreeing to move [A.A.] out of the Spanish Immersion [P]rogram at this time. However, we understand that [A.A.] will be in Ms. Thomas's room tomorrow and Tuesday . . . [, and] we can address the question of her classroom assignment at the [upcoming . . . meeting]."), but A.A. ultimately remained in the general education classroom taught by Brittney Thomas, id. at 543–44; see also id. at 936–37 (Ms. Thomas' testimony that, in September 2014, A.A. transitioned out of the Spanish Immersion Program permanently because "the team decided that that was not a good fit for [A.A.], and after using Ms. Thomas' classroom as a "buddy classroom," a request was made that Ms. Thomas become A.A.'s permanent teacher).

In mid-September 2014, A.A. was found eligible for a Section 504 plan, and a draft plan was prepared.[3] Id. at 547. At about the same time, A.A.'s adoption was finalized, and the

---

[3] The plan falls under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701(a) (2012), which prohibits discrimination against individuals with disabilities by ensuring that "all programs, projects, and activities receiving [federal financial] assistance [are] carried out in a manner consistent with the principles of inclusion, integration, and full participation."

4

hearing officer who considered A.A.'s parents' IDEA administrative due process complaint found that

> [s]tarting in September 2014, [A.A.] experienced an intensely volatile six-week period, characterized by kicking, spitting[,] and cursing, and at times requiring multiple adults to restrain her ("the six-week period"). The six-week period was largely precipitated by [A.A.'s] anxieties around her September 15, 2014 adoption finalization. Life transitions, anniversaries of past life transitions, holidays such as Mother's Day[,] and other events that stir up stressful emotions for her continue to trigger emotional dysregulation . . . ; however, she has not subsequently experienced a period of similarly intense behaviors such [as] occurred during the six-week period.

Id. at 6. A.A. was hospitalized for one night at the end of September 2014, after an incident that occurred at her psychiatrist's office, id. at 102, and shortly thereafter, her parents requested that she be re-evaluated for special education eligibility, id. at 104.

E.A. testified that the school psychologist, Ms. Opuka, encouraged her to reconsider her request for a special education evaluation because "she didn't think [A.A.] would qualify." Id. at 556; see also id. at 108 (October 2014 meeting notes indicating that Ms. Opuka believed that [A.A.] "is still going to look like a typical child when it comes to academics, so that's (our) hesitation with testing."). The Tyler School's personnel were also "concerned about testing [A.A.] too frequently since she had [just recently] had the [October 2013] eval[uation]." Id. Nevertheless, after a November 2014 evaluation, DCPS concluded that although A.A. exhibited "trauma reaction behaviors that frequent [sic] moderate to severe in intensity," these behaviors were "mostly evident in the home and at times in the academic setting," and in any event, because A.A.'s "cognitive functioning f[ell] in the [a]verage range," her "behaviors ha[d] not adversely impacted her current academic progress." Id. at 187. DCPS therefore concluded, in January 2015, that A.A. was ineligible for special education services under the IDEA. Id. at 191.

5

Although A.A. was determined to be ineligible for IDEA special education services, A.A.'s Section 504 plan was finalized in mid-March 2015. Id. at 8; see also id. at 214 (indicating that the effective date of the Section 504 plan was March 17, 2015). The Section 504 plan

> call[ed] for [A.A.] to receive behavioral support services through mental health professionals to address social skills, social skills supports integrated with regular classroom instruction, seating in close proximity to the teacher and other special seating arrangements, an introduction to pertinent school staff/teachers before [A.A.] attends classes/significant interacts with them, repetition of instructions, clear expectations to be set for [A.A.] throughout the day, classroom rules/goals to be reviewed with [A.A.] throughout the school day, a [behavioral intervention plan], a cool out space for [A.A.] within the classroom setting, and that [A.A.] would be tested in a small group setting or one-on-one with a familiar facilitator.

Id. at 8.

After the January 2015 ineligibility determination, A.A.'s parents sought an independent evaluation, which was conducted in March 2015 by Dr. Ann Rowe at the Kingsbury Center. Id. at 563; see also id. at 221 (testing date on evaluation report indicated as March 4, 2015). Dr. Rowe, who is a licensed psychologist, diagnosed A.A. with Disinhibited Social Engagement Disorder, Attention Deficit/Hyperactivity Disorder Hyperactive/Impulsive Type, and Post Traumatic Stress Disorder. Id. at 221, 236; see also id. at 7 (listing the hearing officer's findings regarding A.A.'s medical diagnoses). She recommended the development of an individualized education plan to address A.A.'s learning needs, including placement in a "small classroom setting ([twelve] students or fewer)" and in a "program that minimizes transitions." Id. at 238. At the administrative hearing, after being qualified as an expert in clinical psychology and the evaluation of students with disabilities, id. at 605–06, Dr. Rowe testified that based upon her observations, "it was clear that [A.A.] was emotionally disturbed," id. at 644. Dr. Rowe also testified that it was inappropriate to move A.A. from her first grade classroom to her former

kindergarten classroom when she exhibited behavioral issues, stating that A.A. "should instead receive support so that she can participate in the curriculum." Id. at 647; see also id. ("I believe [the defendant] thought she had a relationship with the kindergarten teacher, so that was possibly the choice. But there are lower expectations in kindergarten for behavior.").

In early May 2015, A.A. attempted to jump out of her second-story bedroom window, id. at 246, and was hospitalized in a children's psychological unit for five days following that incident, see id. at 252 (doctor's letter to the Tyler School recommending several accommodations to ease A.A.'s transition back to school). Thereafter, after reviewing Dr. Rowe's evaluation, DCPS again concluded that A.A. was not eligible for special education services under the IDEA based on a finding that A.A.'s emotional disturbance did not affect her educational performance. See id. at 258–60. And A.A.'s first grade report card showed that by the end of that year, she was performing at the advanced level in all subject areas except World Languages, in which she was performing at the proficient level. Id. at 289.

E.A. estimated that on roughly twenty days during the 2014–2015 school year, A.A. was returned to her kindergarten classroom due to Ms. Thomas's absence because of difficulty regulating her behavior in classrooms headed by substitute teachers. See id. at 549–51; but see id. at 998 (Ms. Thomas's testimony that she could not have been absent for twenty days during the 2014–2015 school year). The hearing officer found that

> [A.A.']s teacher from the 2013–2014 school year (one grade level below [A.A]'s then current grade) was often used as a buddy classroom teacher for [A.A] when [Ms. Thomas] was out for the day, as [A.A.] tended to have difficulty responding appropriately with a substitute teacher at the beginning of the school year. On some occasions [A.A.'s p]arents were supportive of this practice, but they did not anticipate or approve of the practice being used as often as it was during the 2014–2015 school year.

7

Id. at 10–11.  E.A. also testified that A.A. "frequently [had] trouble in [her] specials" classes such as art, media, and physical education, id. at 558, which were taught by teachers other than Ms. Thomas, id. at 942–43 (discussing A.A.'s difficulty transitioning to her specials classes). Ms. Thomas testified that she would confer with A.A.'s specials teachers, but that if they did not discuss A.A.'s behavioral issues with her, she would not have recorded those instances in her assessment of A.A.'s performance.  Id. at 1018–19.

Dissatisfied with DCPS's eligibility determination, A.A.'s parents decided to enroll A.A. at the Lourie Center School ("Lourie School"), effective July 1, 2015, "in order to provide [A.A.] with the special education and therapeutic support that she requires . . . to receive an appropriate education."  Id. at 288.  The Lourie School, a nonpublic school, specializes in the education of children between the ages of four through twelve who are diagnosed with emotional or other psychological disabilities.  See id. at 698–99.  Theresa Petrungaro, the Lourie School's Director of Education who was qualified as an expert in special education at the administrative hearing, id. at 695, 699, 706, testified that based upon her observations of A.A., she believed A.A. qualifies as a student in need of special education services under the IDEA's emotional disturbance category, see id. at 715–18.  Ms. Petrungaro believed that A.A. was "making progress" at the Lourie School, id. at 723, but that she was not ready for a transition back into the public school system at that time, id. at 724–25.

Tiffany Smith, A.A.'s second grade classroom teacher at the Lourie School, who was also qualified as an expert in special education at the administrative hearing, id. at 728, 738–39, testified that

> [A.A.] often has a hard time staying on top, she'll stare off into space or zone out. When you give [A.A.] directions she often does not follow the directions right away and require[s] two or three prompts to follow the direction. . . . Sometimes she'll start the direction and then in the middle of maybe walking around the

8

> classroom she'll just stop and stare and forget what you told her to do. So you have to remind her.

Id. at 741. Regarding A.A.'s attachment disorder and related inappropriate behaviors, Ms. Smith stated that A.A.'s teachers must

> constantly remind [A.A.] of the difference between who you can give hugs to, who you can't—who you say "I love you" to, who you don't[,] and we also teach her the social skills needed, you know, if you want to hug how you ask for a hug.

Id. at 744. And as to A.A.'s anxiety symptoms, Ms. Smith testified that

> [A.A.] is a very bright student, but she is in second grade now to the point where she has to have the instruction in order to have to learn the new skills that she's learning and so if she's not available in the classrooms [because of her anxiety symptoms], she will begin to fall behind in her instruction.

Id. at 750. Ms. Smith stated that in her opinion, A.A. requires special education services under the IDEA. See id. at 756.

A.A. was also evaluated by an educational consultant named Amy Mounce, who was qualified as an expert in special education at the administrative hearing. See id. at 789. Based upon her review of Dr. Rowe's March 2015 independent evaluation, and her own observations of A.A., Ms. Mounce concluded that even though A.A. was performing on grade-level, she nonetheless qualified for special education services under the IDEA. See id. at 793–806. Specifically, Ms. Mounce testified:

> As I said, with the attention, she is impacted with communication, social interaction. She is impacted with transition, following directions, you have to follow directions in order to complete a task . . . [and] to have all the materials that you need to complete the task . . . [. S]o in the classroom, while she may be reading at grade level, but if she has an incident . . . emotionally where she is not able to regulate her emotions or work through a problem, she is not completing that activity, . . . she may disengage[,] or she may engage inappropriately with peers and teachers."

Id. at 806.

Since A.A.'s enrollment at the Lourie School, it appears that A.A.'s psychological condition has not improved. See, e.g., Pls.' Evid. Mot., Exhibit ("Ex.") A (Declaration of S.A.) ¶¶ 8, 12, 14, 19 (describing A.A.'s inappropriate behaviors at school, hallucinations (including hallucinations at school), aggressive behavior toward her parents, and suicidal ideation). Her psychiatrist reported that A.A. is "[o]ften . . . overly tired from medications or lack of sleep and will fall asleep in class." Id., Ex. D (March 2, 2016 Letter from Margriet Van Achterberg, MD). In an April 2016 incident, A.A. reacted negatively to having misspelled a word, resulting in her removal from the classroom for a one-hour period. Id., Ex. E (Behavioral Intervention Data Sheet).

A.A.'s parents filed their administrative complaint on September 21, 2015, and the hearing officer issued her final decision on November 20, 2015, see AR at 3 (setting forth the procedural background), concluding, among other things, that DCPS had not improperly denied A.A. a free appropriate public education "by failing to determine her eligible for special education" services, id. at 18.

## II. STANDARD OF REVIEW

Pursuant to the authority granted by the IDEA, a district court reviewing the findings and decision of an administrative hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Under this standard, the reviewing court owes the hearing officer "'less deference than is conventional' in administrative proceedings." Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting Kerkam ex rel. v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988) ("Kerkam I")). Moreover, "a hearing decision

'without reasoned and specific findings deserves little deference.'" Id. (quoting Kerkam v. Superintendent, D.C. Pub. Schs., 931 F.2d 84, 87 (D.C. Cir. 1991) ("Kerkam II")).

Nevertheless, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982) (internal citations omitted). Rather, the party challenging a hearing officer's determination must "at least take on the burden of persuading the court that the hearing officer was wrong, and . . . a court upsetting the officer's decision must at least explain its basis for doing so." Reid, 401 F.3d at 521 (quoting Kerkam I, 862 F.2d at 887). Moreover, "'[f]actual findings from the administrative proceeding are to be considered prima facie correct.'" Roark ex rel. Roark v. District of Columbia, 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (quoting S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)). Finally, a court must also "defer to the [hearing officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." Savoy v. District of Columbia, 844 F. Supp. 2d 23, 30 (D.D.C. 2012) (quoting S.H., 336 F.3d at 270).

### III. ANALYSIS

#### A. Whether A.A. Qualifies as a Child With an Emotional Disturbance Under the IDEA

The Department of Education includes in its definition of a child with a disability "a child . . . having . . . a serious emotional disturbance (referred to in this part as 'emotional disturbance')." 34 C.F.R. § 300.8(a)(1) (2016).

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> (C) Inappropriate types of behavior or feelings under normal circumstances.
> (D) A general pervasive mood of unhappiness or depression.
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

Id. § 300.8(c)(4)(i). The plaintiffs contend that A.A. meets one or more of these subcategories of emotional disturbance, Pls.' Mem. at 23–38, and that the record demonstrates their adverse impact on A.A.'s educational performance, id. at 38–46. Consistent with the hearing officer's findings, the defendant argues in response that A.A.'s emotional condition and psychological diagnoses do not meet any of the five subcategories of emotional disturbance, Def.'s Mem. at 20–27, and that even if they did, there has been no adverse impact on A.A.'s educational performance, id. at 28–34. Having reviewed the entire record, the Court must disagree with the defendant's positions.

The record shows that A.A.'s psychological condition resulted in her attempts to jump out of her bedroom window on at least two occasions within one year of each other. See AR at 246 (May 2015 e-mail from S.A. informing the Tyler School that A.A. "tried to jump out of her bedroom window" and that she was "admitted to the Children's Psych Unit"); Pls.' Evid. Mot., Ex. C (Psychiatric Institute of Washington D.C. Physician's Discharge Note indicating that "[A.A.] is a [seven] year old female voluntary admit on [February 12,] 2016[,] for attempting to jump out a [second] story window and stating, 'I want to kill myself.[']"). If this evidence does not meet the criteria of "a general pervasive mood of unhappiness or depression" or "inappropriate types of behavior or feelings under normal circumstances," 34 C.F.R. § 300.8(c)(4)(i)(C), (D), particularly given A.A.'s young age, the Court is at a loss as to what conduct would suffice. Cf. Horne ex rel. R.P. v. Potomac Preparatory P.C.S., ___ F. Supp. 3d

___, ___, 2016 WL 3962788, at *10 (D.D.C. July 20, 2016) ("At a minimum, R.P. demonstrated inappropriate behavior (attempting to jump out a window for the stated reason of killing himself) under normal circumstances (while at school)."); N.G. v. District of Columbia, 556 F. Supp. 2d 11, 35 (D.D.C. 2008) ("The Court has already found that N.G. suffers from 'serious emotional disturbance' due to her diagnosis of major depressive disorder, multiple suicide attempts and psychiatric hospitalizations, and behavioral problems."). The Court therefore finds that the preponderance of the evidence before it supports a finding that A.A. exhibits one or more of the characteristics listed in the Department of Education's definition of a serious emotional disturbance.

The more challenging question for the Court to answer is whether A.A.'s mental health condition "adversely affects . . . [her] educational performance." See 34 C.F.R. § 300.8(c)(4)(i). The hearing officer concluded that A.A.'s psychological and behavioral problems did not adversely affect her educational performance. See AR at 20 ("Every measure, including report cards, formal assessments, [and] subject-specific assessments . . . show [A.A] learning, growing, progressing[,] and even thriving academically [] in the general education setting of [the Tyler School] . . . ."). Despite the hearing officer's conclusion, on the record presented by the parties, the Court must conclude that A.A's emotional disturbance did adversely affect her educational performance. While the defendant argues that the Court need only look at A.A.'s average or above-average academic performance to conclude that A.A.'s emotional problems do not adversely impact her educational performance, Def.'s Mem. at 28–29, A.A.'s behavioral issues while at the Tyler School—most notably, the incidents that caused the school to frequently remove her from her first grade classroom and place her in her former kindergarten classroom where she was more comfortable—demonstrate to the Court that A.A. was not able to

13

consistently remain in a grade-level-appropriate classroom because of her anxiety and mood disorders, see AR at 20 (hearing officer observing that "[t]he buddy classroom [the Tyler School] utilized with [A.A.] was not ideal, particularly because the buddy classroom they used for her was in a lower grade"); see also id. at 235 (Dr. Rowe's expert opinion that "it is important to distinguish between 'containment' and 'accommodation.' Containment strategies, such as moving [A.A.] to kindergarten when her teacher is absent or not allowing her to attend specials, remove her from important academic content and are not appropriate interventions. These strategies manage the child's behavior by removing the student from participation in the regular school program. Accommodations are strategies that facilitate a student's participation in age-appropriate classroom experiences. DCPS's use of containment strategies while at the same time maintaining that the student does not have social and emotional difficulties is inconsistent."). A contrary finding on facts such as these would serve to punish innately talented students who, by virtue of their inherent intellectual capacity, attain good grades but nonetheless need special education services to fully participate in the school's curriculum. See 34 C.F.R. § 300.101(c) ("Each State must ensure that [a free appropriate education] is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade." (emphasis added)); see also G.D. v. Wissahickon Sch. Dist., 832 F. Supp. 2d 455, 466 (in case involving a child who was performing well academically, finding "applicable the principle . . . [that] academic progress cannot serve as the sole 'litmus test' for eligibility" and concluding that the school district "had an obligation to look simply beyond [the child's] cognitive potential or academic progress and to address the attentional issues and behaviors . . . identified as impeding his progress.") (quoting West Chester Area Sch. Dist. v. Bruce C., 194 F. Supp. 2d 417, 421

14

(E.D. Pa. 2002)); Scott v. District of Columbia, No. 03-1672 DAR, 2006 WL 1102839, at *2, 8–10 (D.D.C. Mar. 31, 2006) (finding that DCPS denied student whose academic performance was deemed "on target" but who was diagnosed with Attention Deficit Hyperactivity Disorder by failing to recognize him as a child with a serious emotional disturbance and instead characterizing the child's problems as merely behavioral); cf. Mr. I v. Maine Sch. Admin. Dist. 55, 416 F. Supp. 2d 147, 160–61 (D. Me. 2006) (analyzing the definition of "serious emotional disturbance" and concluding that "[t]he regulation does not require that the condition affect educational performance over a long period of time. This reading of the regulation makes sense: it requires that a school offer services to a child as soon as the adverse effect on educational performance manifests itself, not wait a 'long period of time,' thereby risking complete failure, nonpromotion, or other educationally damaging results.").[4]

The hearing officer dismissed Dr. Rowe's independent evaluation, stating that the "data do not support" the conclusion that A.A. was experiencing an adverse educational impact. AR at 20. Specifically, the hearing officer did not credit Dr. Rowe's independent evaluation of A.A.'s need for special education services, finding that the evaluation "did not take the position that [A.A.] required special education services in order to access the general education curriculum."

---

[4] The Court disagrees with the unpublished opinion of another member of this Court in E.L. Haynes Public Charter School v. Frost, No. 14-1472, ECF No. 23 (Dec. 22, 2015), which the defendant relies on as support for its argument that A.A.'s academic performance should be given primacy in the Court's determination, Def.'s Mem. at 29–30, because the conclusion reached by the court in E.L. Haynes, i.e., that the student's academic performance did not warrant a finding of eligibility for special education services, see No. 14-1472, ECF No. 23, at 34, is directly at odds with the Department of Education's regulation mandating that states provide a free appropriate education to any disabled child even if the child is advancing from grade to grade or is not performing poorly academically, see 34 C.F.R. § 300.101(c); see also Rowley, 458 U.S. at 202 n. 25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"). The facts in E.L. Haynes are also distinguishable from this case in one key aspect: there was no evidence in E.L. Haynes that the student in that case was removed by the school from the child's classroom due to her emotional problems, see generally No. 14-1472 at 2–10 (setting forth the facts of the case) whereas here, the Tyler School implemented a "buddy classroom" system to address A.A.'s problems during her first grade year that entailed sending her back to her kindergarten teacher on numerous occasions, see AR at 20 ("The buddy classroom [the Tyler School] utilized with [A.A.] was not ideal, particularly because the buddy classroom they used for her was in a lower grade.")

Id. (emphasis added). But this finding, apparently based solely upon a series of questions during Dr. Rowe's cross-examination, see id. at 676 ("Q: Okay, so in your report you wrote that '[A.A] should be provided with special education services,' correct – A: Right. Q – 'as a child with an emotional disturbance,' right? A. Right. Q. And the reason she should be provided with special education services is to improve her coping and develop basic social skills, right? A: Right. Q: You do not write that she requires special educational services to access the general curriculum, correct? You did not write that, right? . . . A: I did not say that."), is squarely at odds with Dr. Rowe's repeated expert opinion that A.A. is eligible for special education services under one or more of the definitions of "emotional disturbance," see id. at 650–51 (Dr. Rowe listing A.A.'s eligibility under subsections (B), (C), and (E) of the "emotional disturbance" definition contained in 34 C.F.R. § 300.8(c)(4)(i)); id. at 674 (Dr. Rowe restating her belief that A.A. was eligible for special education services); see also id. at 686–87 (Dr. Rowe clarifying that although she did not indicate that A.A. needs special education services with regarding to, for instance, reading or math, she nevertheless needed "special behavior management techniques to access the curriculum, because her functioning fluctuates during the school day" (emphasis added)), and the recommendation contained in Dr. Rowe's report that an individualized education plan should be established for A.A. to address her needs, see id. at 238 (Dr. Rowe's recommendation that "[t]he [multi-disciplinary team] should meet to develop an Individual Education Plan which includes both services and accommodations"). The Court must reject the hearing officer's reliance on just a portion of Dr. Rowe's testimony that clearly does not reflect the entirety of her expert opinion.

For all of these reasons, the Court finds that DCPS failed to offer A.A. a free appropriate public education under the IDEA by declining to find her eligible for special education services as a child with an emotional disturbance that adversely affects her educational performance. The

16

Court will therefore grant the plaintiff's motion for summary judgment and reverse the hearing officer's determination on this issue.

### B. Reimbursement of the Costs of A.A.'s Education at the Lourie School

The plaintiffs also seek reimbursement of the cost of A.A.'s education at the Lourie School. Pls.' Mem. at 49–52. Under the IDEA, "[i]f no suitable public school is available [to meet a disabled child's educational needs], the [school system] must pay the costs of sending the child to an appropriate private school." Reid, 401 F.3d at 519 (second alteration in original) (quoting Jenkins v. Squillacote, 935 F.2d 303, 305 (D.C. Cir. 1991)). The District of Columbia Circuit recently explained that

> [a]s interpreted by the Supreme Court, [the] IDEA requires school districts to reimburse parents for their private-school expenses if (1) school officials failed to offer the child a free appropriate public education in a public or private school; (2) the private-school placement chosen by the parents was otherwise "proper under the Act"; and (3) the equities weigh in favor of reimbursement—that is, the parents did not otherwise act "unreasonabl[y]."

Leggett v. District of Columbia, 793 F.3d 59, 66–67 (D.C. Cir. 2015) (second alteration in original). Although the Court finds sufficient evidence in the record to reverse the hearing officer's finding of A.A.'s ineligibility for special education services, the hearing officer's determination did not opine on the question of the appropriateness of A.A.'s placement at Lourie and reimbursement of the reasonable cost of her attendance at that school. See generally AR at 3–24. The Court will therefore remand this matter to the hearing officer for an administrative determination of this issue in the first instance. See Reid, 401 F.3d at 526 ("[I]n light of the absence of pertinent findings in the administrative record . . . , the district court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings.").

## IV. CONCLUSION

Having found that DCPS failed to provide a free appropriate public education to A.A., the Court will grant in part and deny in part the plaintiffs' motion for summary judgment, deny the defendant's cross-motion for summary judgment, reverse the hearing officer's finding of A.A.'s ineligibility for special education services, and remand this case to the agency for an administrative determination of the appropriateness of A.A.'s placement at Lourie and the reasonable costs the plaintiffs should be reimbursed.

**SO ORDERED** this 20th day of April, 2017.[5]

REGGIE B. WALTON<br>United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.